**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FRANCISCO JAVIER VEGA-ANGUIANO,

*Petitioner*,

v.

WILLIAM P. BARR, Attorney General,

*Respondent.*

No. 15-72999

Agency No. A075-268-076

ORDER AND AMENDED OPINION

On Petition for Review of an Order of Immigration and Customs Enforcement

Argued and Submitted April 8, 2019
Seattle, Washington

Filed November 19, 2019
Amended November 24, 2020

Before: William A. Fletcher, Consuelo M. Callahan, and Morgan Christen, Circuit Judges.

Order;
Opinion by Judge W. Fletcher;
Concurrence by Judge Christen;
Dissent by Judge Callahan
Concurrence in Order by Judge W. Fletcher;
Dissent from Order by Judge Bennett

**SUMMARY**[*]

**Immigration**

The panel filed (1) an order stating that the opinion, concurrence, and dissent filed November 19, 2019 are amended by the opinion, concurrence, and dissent filed concurrently with the order, and denying on behalf of the court a petition for rehearing en banc; and (2) an amended majority opinion, concurrence, and dissent. In the amended opinion, the panel granted Francisco Vega-Anguiano's petition for review of an order of Immigration and Customs Enforcement ("ICE") reinstating his prior order of removal, and held that that: (1) 8 U.S.C. § 1252(b)(1) establishes a thirty-day deadline for seeking review of reinstatement orders; (2) because Vega-Anguiano timely challenged his reinstatement order, the court had jurisdiction to consider a collateral attack on his underlying removal order contending that the execution of that order resulted in a gross miscarriage of justice; (3) Vega-Anguiano established a gross miscarriage of justice because his removal order lacked a valid legal basis when it was executed; and (4) there is no diligence requirement that limits the time during which a such a collateral attack may be made.

In 1998, an Immigration Judge ordered Vega-Anguiano removed based on a conviction for possession of a controlled substance, but the government took no steps to remove him. In 1999, his conviction was expunged under California Penal Code § 1203.4, a rehabilitative statute. For convictions

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

occurring prior to July 14, 2011, the government may not remove an alien on the basis of a simple drug possession conviction, if the conviction has been expunged under a state rehabilitative statute and the alien satisfies the requirements of the Federal First Offender Act ("FFOA"). The panel noted that the government conceded at oral argument that Vega-Anguiano met all the requirements of the FFOA when his conviction was expunged. In 2008, Vega-Anguiano was removed to Mexico pursuant to the 1998 order, but illegally reentered the United States. In 2013, he moved to reopen his 1998 proceedings, but the BIA denied the motion as untimely, and this court denied his petition for review. In 2014, Vega-Anguiano was convicted of "misprision of a felony," and ICE reinstated his prior order of removal.

Vega-Anguiano filed a timely petition for review of the reinstatement order, maintaining that the execution of the removal order resulted in a "gross miscarriage of justice," and that he could therefore collaterally challenge the removal order as part of his timely challenge to the reinstatement order. The government contended that the court lacked jurisdiction over Vega-Anguiano's collateral attack on the ground that it was untimely under 8 U.S.C. § 1252(b)(1), which requires a petition for review to be filed within thirty days of a final "order of removal." The panel rejected that argument.

The panel held that § 1252(b)(1) establishes the time limit for seeking review of reinstatement orders. The panel explained that circuit precedent establishes that § 1252(a)(1), which authorizes judicial review of a "final order of removal," also authorizes judicial review of reinstatement orders. The panel next explained that § 1252(b)(1) establishes the time for bringing a challenge to a "final order

of removal." The panel concluded that the phrase "final order of removal" in § 1252(b)(1) has the same meaning as the identical phrase in § 1252(a)(1). The panel further noted that there is no other statute that establishes a time limit for seeking judicial review of a reinstatement order, that it is inconceivable that no statute establishes that time limit, and that it has been widely and appropriately assumed that § 1252(b)(1) establishes that time limit.

Because Vega-Anguiano timely filed his petition for review of his reinstatement order, the panel held that it had jurisdiction to consider any collateral attack reviewable under § 1252(a)(2)(D), which provides that the courts of appeal have jurisdiction to consider constitutional claims and questions of law raised upon a petition for review. Relying on *Garcia de Rincon v. DHS*, 539 F.3d 1133 (9th Cir. 2008), the panel specifically held that it had jurisdiction to consider Vega-Anguiano's contention that the execution of his invalid removal order resulted in a gross miscarriage of justice. The panel explained that the BIA has held, in cases such as *Matter of Farinas*, 12 I. & N. Dec. 467 (BIA 1967), that a gross miscarriage of justice occurs when a deportation or removal order had no legal basis at the time of its issuance *or* at the time of its execution. The panel noted that the BIA has continued to apply *Farinas*, the court's sister circuits have followed it, and that this court's case law is consistent with it.

The panel held that Vega-Anguiano had established a gross miscarriage of justice because there was no valid legal basis for his removal order at the time it was executed in 2008, explaining the conviction on which the order had been based had been expunged and, as a result, he met the requirements of the FFOA. The panel also held that the gross miscarriage of justice standard does not include a diligence

requirement that limits the time during which a collateral attack may be made based on a showing of gross miscarriage of justice. The panel explained that the controlling BIA decision was *Farinas*, where the BIA declined to fault Farinas either for his failure to appeal his original deportation order, or for the sixteen-year gap between his deportation and his collateral challenge.

Concurring, Judge Christen agreed that the court had jurisdiction, but wrote separately to emphasize the record in this case, which she concluded necessitated granting the petition. Judge Christen wrote that the government had contended that Vega-Anguiano did not submit his expungement order until 2014, but it was established, at oral argument, that counsel did not know what was in Vega-Anguiano's immigration file at the time of the reinstatement decision and that the file would have been incomplete without that order. Judge Christen observed that Vega-Anguiano notified the BIA of the expungement at least by November of 2013, when he filed his motion to reopen, and that the records were riddled with errors that signal the agency had incorrect information.

Dissenting, Judge Callahan wrote that the panel is bound by this court's decision in *Morales-Izquierdo v. Gonzales*, 486 F.3d 484 (9th Cir. 2007) (en banc), in which the court held that reinstatement of a prior removal order—regardless of the process afforded in the underlying order—does not offend due process because reinstatement of a prior order does not change the alien's rights or remedies. It follows, wrote Judge Callahan, that Vega-Anguiano's petition for review from his reinstatement order does not allow the panel to consider challenges to his underlying order. Judge

Callahan further observed that the majority of this court's sister circuits are in accord with that position.

Judge Callahan also wrote that the majority's reliance on *Farinas* failed for two reasons. First, it was not true that Vega-Anguiano's order could not have withstood judicial attack under the law at the time of his removal; rather, the expungement of his conviction under a rehabilitative statute did not mean his possession conviction was no longer a conviction under the immigration laws, and the "fact" that he might have been *eligible* for relief under the FFOA did not make his removal order legally invalid. Second, Judge Callahan concluded that Vega-Anguiano had not made a sufficient showing of injustice, noting that he was arrested and convicted for cocaine possession, his expungement was under a rehabilitative statute, and he was hardly prejudiced by the fact that he was not removed until 2008. Judge Callahan explained that the government's failure to anticipate a request for FFOA relief did not make the 2008 removal a miscarriage of justice, and that there was no injustice in the reinstatement of his order after he illegally reentered the country and was convicted of a misprision of a felony.

Concurring in the denial of rehearing en banc, Judge W. Fletcher, joined by Judge Christen, responded to arguments made in the dissent from the denial of the petition for rehearing en banc. Judge W. Fletcher wrote that there were three problems with his dissenting colleague's conclusion that the thirty-day time limits for bringing direct and collateral challenges to an original removal order both run from the same date—the date of entry of the original removal order. First, that conclusion conflates direct and collateral challenges; if the time for filing a direct and a collateral challenge run from the same date, there is never a reason to

bring a collateral challenge. Second, it is not possible as a practical matter to bring a challenge to a reinstatement order within thirty days of the entry of the underlying removal order; if § 1252(b)(1) does not provide a separate time period for filing a petition for review of a reinstatement order, running from the date of that order, no reinstatement order can ever be challenged, on any ground. Third, if a collateral challenge must be made within the same time period as a direct challenge, the basis for some collateral attacks will not yet exist, as shown by Vega-Anguiano's case. In that respect, Judge W. Fletcher wrote that, if his dissenting colleague and the other circuits are right that a collateral challenge must be brought within thirty days of the entry of the original removal order, a challenge that they agree in theory is available, cannot in fact be brought.

Dissenting from the denial of rehearing en banc, Judge Bennett—joined by Judges Callahan, M. Smith, Ikuta, R. Nelson, Bade, Collins, Lee, Bress, Hunsaker, Bumatay, and VanDyke—wrote that eight other circuits think "order of removal" means "order of removal," but that the majority, apparently unhappy with the statute Congress wrote, rewrote "order of removal" as "reinstatement order."

Judge Bennett wrote that the majority relied on three inapposite sources. First, the majority claimed to follow circuit precedent in reading § 1252(b)(1)'s "final order of removal" to cover *both* a final removal order and a reinstatement order, but contradicted itself by reading the phrase as applying to *only* reinstatement orders. Second, Judge Bennett wrote that the majority erred in concluding that the court had never addressed whether the gross miscarriage of justice standard includes a diligence component, and in concluding that *Farinas* was controlling on that issue. Judge

Bennett explained that this court, in *De Souza v. Barber*, 263 F.2d 470 (9th Cir. 1959), held that there is a timeliness requirement in this context. Further, Judge Bennett wrote that *Farinas* was irrelevant; it was silent on the issue of timeliness and, more importantly, § 1252(b)(1) circumscribes this court's jurisdiction, which is not defined by the BIA. Third, Judge Bennett wrote that the majority's reliance on equitable principles to create an exception to a jurisdictional rule imposed by Congress contravenes Supreme Court and circuit precedent.

Judge Bennett also wrote that the majority's decision will lead to unjust outcomes and perverse incentives, noting that, in *Morales-Izquierdo*, an en banc panel of this court warned that "an alien who respects our laws and remains abroad after he has been removed should have no fewer opportunities to challenge his removal order than one who unlawfully reenters the country despite our government's concerted efforts to keep him out." Judge Bennett concluded that the majority turns this obvious principle on its head and rewards those who break the law, explaining that majority waives the thirty-day deadline and gives the removed alien a second bite at the apple, provided that he illegally reenters the country and is subject to a reinstatement order, but that the alien with the same claim who does not illegally reenter, however, gets no such chance. Judge Bennett wrote that the facts here added another layer of perversity because a prior panel of this court affirmed the BIA's denial of the motion to reopen on the ground that Vega-Anguiano failed to establish due diligence. Judge Bennett wrote that, under the majority's rule that diligence is not required, Vega-Anguiano can essentially reverse the prior panel's decision and get a third bite at the apple.

**COUNSEL**

Robert Pauw (argued), Gibbs Houston Pauw, Seattle, Washington, for Petitioner.

Todd J. Cochran (argued) and Robbin K. Blaya, Trial Attorneys; Daniel E. Goldman and Bryan S. Beier, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**ORDER**

The opinion, concurrence, and dissent filed November 19, 2019, and published at 942 F.3d 945 are amended by the opinion, concurrence, and dissent filed concurrently with this order.

With this amendment, Judges W. Fletcher and Christen have voted to deny respondent's petition for rehearing en banc (Dkt. Entry 57). Judge Callahan has voted to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35(f).

The petition for rehearing en banc is **DENIED**. No further petitions for panel rehearing or rehearing en banc may be filed.

## OPINION

W. FLETCHER, Circuit Judge:

On February 25, 2014, Immigration and Customs Enforcement ("ICE") reinstated Francisco Vega-Anguiano's prior order of removal. Vega-Anguiano filed a timely petition for review. He challenges the reinstatement order, contending that the removal order was invalid when executed. The conviction upon which that the removal order depended was expunged before he was removed. The government conceded at oral argument that the expungement removed the legal justification for the removal order. Vega-Anguiano thus maintains that the execution of the removal order resulted in a "gross miscarriage of justice," and that he may therefore collaterally challenge the removal order as part of his timely challenge to the reinstatement order. We agree and grant the petition.

## I. Jurisdiction

"We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review a reinstatement order . . . and retain jurisdiction under § 1252(a)(2)(D) to consider 'constitutional claims or questions of law raised upon a petition for review.'" *Villa-Anguiano v. Holder*, 727 F.3d 873, 875 (9th Cir. 2013) (quoting *Garcia de Rincon v. DHS*, 539 F.3d 1133, 1137–38 (9th Cir. 2008)) (first internal quotation omitted). The jurisdictional savings clause of § 1252(a)(2)(D) "permits some collateral attack on an underlying removal order during review of a reinstatement order if the petitioner can show that he has suffered a 'gross miscarriage of justice' in the initial deportation proceeding." *Garcia de Rincon*, 539 F.3d at 1138.

The government contends that we lack jurisdiction over Vega-Anguiano's collateral attack under § 1252(a)(1) because, in its view, his collateral attack on his removal order is untimely. We disagree.

A petition for review filed under § 1252(b)(1) triggers judicial review and the exercise of jurisdiction under § 1252(a)(1). Because Vega-Anguiano filed his petition for review of his reinstatement order under § 1252(b)(1), he may bring any collateral attack authorized by § 1252(a)(1).

We know from *Villa-Anguiano* and *Garcia de Rincon* that § 1252(a)(1) authorizes judicial review of reinstatement orders. We also know that § 1252(b)(1) establishes the time limit for bringing a challenge under § 1252(a)(1). The question is whether § 1252(b)(1) establishes the time limit not only for challenging final orders of removal, but also for challenging final reinstatement orders. The answer is "yes." The phrase "final order of removal" in § 1252(b)(1) refers to both a final order of removal and a final reinstatement order.

Section 1252(a)(1) authorizes "[j]udicial review of a final order of removal." We have repeatedly held, beginning with *Castro-Cortez v. INS*, 239 F.3d 1037, 1044 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006), that the phrase "final order of removal" in § 1252(a)(1) covers both a final removal order and a final reinstatement order. Section 1252(b)(1) provides, "The petition for review must be filed not later than thirty days after the date of the final order of removal." The natural, indeed inescapable, reading of these immediately adjoining statutory sections is that phrase "final order of removal" in § 1252(b)(1) has the same meaning as the identical phrase in § 1252(a)(1).

There is no other statute that establishes a time limit for seeking judicial review of a reinstatement order. It is inconceivable that no statute establishes that time limit, and it has been widely and appropriately assumed that § 1252(b)(1) establishes the time limit for seeking review of reinstatement orders. *See*, *e.g.*, *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012). Today, we hold rather than merely assume that this is, in fact, the law.

Vega-Anguiano timely petitioned for review of his reinstatement order under § 1252(b)(1). We therefore have jurisdiction over his petition under § 1252(a)(1). In the exercise of that jurisdiction, we may consider any collateral attack authorized under § 1252(a)(2)(D). *See Villa-Anguiano v. Holder*, 727 F.3d at 875. Specifically, as we wrote in *Garcia de Rincon,* we have jurisdiction under § 1252(a)(1) to consider a collateral attack in which a petitioner contends that the execution of his invalid removal order resulted in a "gross miscarriage of justice."

## II.  Factual Background

In 1988, when Vega-Anguiano was fourteen years old, he was arrested for "possession of a controlled substance, to-wit: Cocaine" in violation of California Health and Safety Code § 11350. The arrest did not result in a conviction, but Vega-Anguiano was required to attend drug classes. In 1991, Vega-Anguiano was stopped for driving without a license. When a record check revealed that he had not completed the drug classes, he was placed back into criminal proceedings on the 1988 possession charge. On September 19, 1991, Vega-Anguiano pleaded guilty to the by-then three-year-old possession charge. This was Vega-Anguiano's only conviction prior to his removal.

After his release from incarceration on the possession conviction, Vega-Anguiano married his girlfriend, who was a lawful permanent resident (and is now a U.S. citizen). Soon thereafter, he and his wife attempted to legalize his status. Vega-Anguiano's application for adjustment of status was denied because of his 1991 conviction, and he was placed in removal proceedings. In December 1998, an Immigration Judge ordered Vega-Anguiano removed based on INA § 212(a)(2)(A)(i)(II) (conviction of a controlled substance violation). Vega-Anguiano's attorney failed to timely file an appeal to the Board of Immigration Appeals ("BIA"). The former Immigration and Naturalization Service took no steps to remove Vega-Anguiano.

In September 1999, while he was still in this country, Vega-Anguiano's 1991 conviction was expunged under California Penal Code § 1203.4, a rehabilitative statute. For convictions occurring prior to July 14, 2011, the government may not remove an alien on the basis of a simple drug possession conviction, if the conviction has been expunged under a state rehabilitative statute and the alien has satisfied the requirements of the Federal First Offender Act. *See Nunez-Reyes v. Holder*, 646 F.3d 684 (9th Cir. 2011); *Lujan-Armendariz v. INS*, 222 F.3d 728, 749–50 (9th Cir. 2000).[1] To qualify for this exception to removability, the alien must show that "(1) the conviction was his first offense; (2) he had

---

[1] The dissent states that *Nunez-Reyes* "held that we would only apply [that] decision prospectively to protect those who relied on *Lujan-Armendariz*" and that "[i]t does not appear that Vega-Anguiano relied on *Lujan-Armendariz* . . . ." But *Nunez-Reyes* did not require a showing of reliance. To the contrary, it set out a bright-line rule: "For those aliens convicted before the publication date of this decision, *Lujan-Armendariz* applies. For those aliens convicted after the publication date of this decision, *Lujan-Armendariz* is overruled." *Nunez-Reyes*, 646 F.3d at 694.

not previously been accorded first offender treatment; (3) his conviction was for possession of drugs, or an equivalent or lesser charge such as possession of drug paraphernalia; and (4) he received relief under a state rehabilitative statute." *Ramirez-Altamirano v. Holder*, 563 F.3d 800, 812 (9th Cir. 2009) (quotation marks and citations omitted).

The government conceded at oral argument that Vega-Anguiano met all four criteria as soon as his conviction was expunged in 1999. His 1991 conviction was his first offense; he had not been previously accorded first offender treatment; his conviction was for simple possession; and he received relief under a rehabilitative statute. The expungement of Vega-Anguino's 1991 conviction thus removed the legal basis for his 1998 removal order. *Wiedersperg v. INS*, 896 F.2d 1179, 1182 (9th Cir. 1990) ("[T]he nullification of a conviction upon which deportability is premised deprives deportation of a legal basis.").

ICE nonetheless arrested Vega-Anguiano in January 2008. His attorney failed to file a motion to reopen, and Vega-Anguiano was removed to Mexico in February 2008 pursuant to the no-longer-valid 1998 removal order. Several weeks later, he illegally reentered the United States.

In November 2013, Vega-Anguiano filed a motion to reopen his 1998 proceeding. He explained in the motion that his 1991 conviction had been expunged in 1999. He argued for equitable tolling based on his attorneys' ineffective assistance of counsel in 2008. The BIA denied as untimely the motion to reopen. Vega-Anguiano filed a petition for review of the BIA's denial in this court. We held that the BIA did not abuse its discretion in finding that Vega-

Anguiano had failed to act with the diligence required for equitable tolling.

On January 28, 2014, Vega-Anguiano was convicted of "misprision of a felony," in violation of 18 U.S.C. § 4, and was sentenced to five-and-a-half months imprisonment. "Misprision of a felony" is committed when a defendant has full knowledge of the fact that the principal committed and completed a felony, but the defendant failed to notify the authorities and took an affirmative step to conceal the crime. *See United States v. Ciambrone*, 750 F.2d 1416, 1417 (9th Cir. 1984); *see also* 18 U.S.C. § 4. The felony at issue related to cock-fighting.

In 2014, ICE reinstated Vega-Anguiano's 1998 removal order. Vega-Anguiano timely filed a petition for review of the reinstatement order. In his petition, Vega-Anguiano collaterally attacks the underlying removal order as a "gross miscarriage of justice" on the ground that it was invalid when executed. He also argues that ICE violated its own regulations and his due process rights during the reinstatement proceeding.

## III. Discussion

There are strict limitations on collateral attacks on prior removal orders. Collateral attack is largely reserved for cases in which the removal order could not have withstood judicial scrutiny under the law in effect at the time of either its issuance *or* its execution. *See, e.g.*, *Matter of Farinas*, 12 I. & N. Dec. 467 (BIA 1967). Because the conviction on which Vega-Anguiano's removal was based had been expunged in 1999, there was no valid legal basis for the removal order at the time of its execution in 2008. Under

long-standing law, a removal in such circumstances is a "gross miscarriage of justice." We therefore conclude that this is one of the rare cases where a collateral attack is appropriate.

The rule that prior removal orders are not generally subject to collateral attack is codified at 8 U.S.C. § 1231(a)(5). If "an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." § 1231(a)(5). However, under § 1252(a)(2)(D), we retain jurisdiction to review an underlying removal order "if the petitioner can show that he has suffered a 'gross miscarriage of justice' in the initial deportation proceeding." *Garcia de Rincon*, 539 F.3d at 1138 (citation omitted).

The BIA has consistently held that "an alien may collaterally attack a final order of exclusion or deportation in a subsequent deportation proceeding only if she can show that the prior order resulted in a gross miscarriage of justice." *Matter of Roman*, 19 I. & N. Dec. 855, 856–57 (BIA 1988); *see also Matter of Malone*, 11 I. & N. Dec. 730, 731–32 (BIA 1966) (finding a gross miscarriage of justice where an alien's deportation order was clearly not in accord with the law as interpreted at the time of issuance); *Farinas*, 12 I. & N. at 471–72 (finding a gross miscarriage of justice where an alien's deportation order, which was valid when entered, became invalid by virtue of controlling circuit precedent issued prior to the execution of the order).

The BIA has held that a gross miscarriage of justice occurs when a deportation or removal order had no valid legal

basis at the time of its issuance *or* at the time of its execution. For example, in *Farinas*, 12 I. & N. at 472, the BIA held that "the decision in [Farinas's] case could not have withstood judicial attack under the law as it was then (and still is) interpreted.  This being the case, a showing of gross miscarriage of justice has been made." Farinas was convicted in 1936 of burglary, a crime of moral turpitude, while a permanent resident.  After completing his sentence, Farinas worked for a company that regularly sent him to Alaska to work in a cannery.  In July 1942, the ship that was taking Farinas to Alaska stopped in Vancouver, Canada, and Farinas briefly went ashore.  After arriving in Alaska, he was inspected and admitted into the United States.  In 1944, Farinas was convicted of abducting a female under 18 years of age for sexual intercourse and was sentenced to five years in prison.  In 1946, Farinas was ordered deported for being inadmissible (based on his burglary conviction) at the time of his entry into the United States in 1942.  However, two cases decided shortly thereafter made clear that Farinas was not deportable as charged because his arrival in Alaska was not properly deemed an "entry" under the immigration laws. *See DiPasquale v. Karnuth*, 158 F.2d 878 (2d Cir. Jan. 11, 1947); *Delgadillo v. Carmichael*, 332 U.S. 388 (Nov. 10, 1947). Nonetheless, Farinas was deported from the United States in 1950 when he finished serving his sentence.

Farinas illegally re-entered the United States in 1966, sixteen years later, and was placed in deportation proceedings that same year.  In those proceedings, Farinas challenged the validity of his deportation in 1950.  The BIA concluded that the original 1946 deportation order was invalid at the time it was executed in 1950.  The BIA wrote that "from November 1947 until respondent's deportation in May 1950, the decision in respondent's case could not have withstood

judicial attack under the law as it was then (and still is) interpreted." *Farinas*, 12 I. & N. at 472. Because Farinas's 1950 deportation lacked a valid legal basis at the time of his deportation, the BIA concluded that in 1966, sixteen years after the deportation, Farinas had made "a showing of gross miscarriage of justice" that permitted a collateral attack on the original deportation order. *Id*. That is, the BIA refused to give legal effect to the prior deportation order despite Farinas's failure to appeal that order at the time it was issued and despite the sixteen-year gap between Farinas's deportation and 1966. *Id*. at 469.

The BIA has continued to apply *Farinas* as good law. *See In Re: Daniel Espino-Medina A.K.A. Daniel Espino*, 2016 WL 1722509, at *2 (BIA Apr. 5, 2016) ("Under our precedents, enforcement of a removal order would result in a gross miscarriage of justice only if the order clearly could not have withstood judicial scrutiny under the law in effect at the time of its issuance *or* initial execution.") (citing *Farinas*, 12 I & N at 471–72) (emphasis added); *see also In Re: Roman Miguel Duran-Alvarado A.K.A. Roman Alvarado*, 2014 WL 7691451, at *2 (BIA Dec. 17, 2014) (same); *In Re: Julio Alexander Guzman-Vasquez*, 2014 WL 1118477, at *1 (BIA Feb. 18, 2014) (same); *In Re: Tunbosun Olawale William*, 2008 WL 5537807, at *3 (BIA Dec. 23, 2008) (same).

Our sister circuits have followed *Farinas*'s approach. For example, the Seventh Circuit has observed that a gross miscarriage of justice occurs when "the individual should not have been deported based on the law as it existed at the time of the original deportation." *Robledo-Gonzales v. Ashcroft*, 342 F.3d 667, 682 n.13 (7th Cir. 2003) (citing *Farinas*, 12 I & N 467); *see also Debeato v. Attorney Gen. of U.S.*,

505 F.3d 231, 236 (3d Cir. 2007) (adopting *Robledo-Gonzales*'s approach to the gross miscarriage of justice standard).

Our circuit's case law is consistent with *Farinas*. In *Hernandez-Almanza v. INS*, 547 F.2d 100, 102 (9th Cir. 1976), we cited *Farinas* for the proposition that "an exclusion order may not be attacked at a subsequent hearing unless there was a gross miscarriage of justice at the prior proceedings." Hernandez-Almanza was ordered excluded in 1971 based on a prior conviction and was promptly returned to Mexico. He reentered the U.S. without inspection in 1972. In 1973, he was served with an Order to Show Cause for why he should not be deported. Pending the hearing on that order, he obtained an order from the state court vacating his 1971 guilty plea. Following the logic of *Farinas*, which allows a collateral attack when a predicate conviction was vacated before execution of the challenged deportation order, we held that Hernandez-Almanza could not collaterally attack the 1971 order because "he failed to institute proceedings to vacate his conviction *prior to* his [1971 exclusion]." *Id*. at 103 (emphasis added).

Vega-Anguiano, in contrast to Hernandez-Almanza, had his conviction expunged prior to—indeed, many years prior to—the execution of his removal order in 2008. As we noted above, and as the government has conceded, the expungement eliminated the legal basis for his removal order because Vega-Anguiano met the requirements of the Federal First Offender Act. Thus, by the time of Vega-Anguiano's removal in 2008, his removal order lacked a valid legal basis. Under *Farinas*, the execution of his invalid removal order resulted in a "gross miscarriage of justice." 12 I. & N. at 472.

We have never addressed whether the gross miscarriage of justice standard includes a diligence component. The controlling BIA decision is *Farinas*. The BIA declined to fault Farinas either for his failure to appeal his original deportation order, or for the sixteen-year gap between his initial invalid deportation and his collateral challenge to that deportation during his later deportation proceedings.

The BIA noted in *Farinas* that the initial deportation order was legally invalid at the time of his deportation. It wrote, "This being the case, a showing of gross miscarriage of justice has been made." 12 I. & N. at 472. *Farinas* is on all fours with Vega-Anguiano's case. It established two propositions. First, where an alien has been removed on the basis of a deportation or removal order that lacked a valid legal basis at the time of its issuance or execution, a gross miscarriage of justice occurs. Second, there is no diligence requirement that limits the time during which a collateral attack on the deportation or removal order may be made based on a showing of gross miscarriage of justice.

The equitable concept that diligence should not be demanded of individuals who were previously removed on an invalid legal basis, and who, as a result, face adverse legal consequences in new proceedings, is familiar. We have endorsed this concept in the context of illegal reentry prosecutions under 8 U.S.C. § 1326. Normally, an alien can challenge the validity of a prior removal order as a defense to illegal reentry only if he demonstrates that (1) he has exhausted any administrative remedies that may have been available to seek relief from the order; (2) the removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair. 8 U.S.C.

§ 1326. "But under our circuit's law, if Defendant was not convicted of an offense that made him removable under the INA to begin with, he is excused from proving the first two requirements." *United States v. Ochoa*, 861 F.3d 1010, 1015 (9th Cir. 2017).

Our dissenting colleague contends that *Morales-Izquierdo v. Gonzales*, 486 F.3d 484 (9th Cir. 2007) (en banc), requires a different result. We disagree.

The central question in *Morales-Izquierdo* was whether an immigration officer (as distinct from an Immigration Judge) could reinstate a removal order. We held that an immigration officer could do so. A further question was whether a removal order could be reinstated—by either an immigration officer or an Immigration Judge—if there had been a due process violation during the underlying removal proceeding. Our case law at the time was that "[t]he INS cannot reinstate a prior order of removal that did not comport with due process." *Arreola-Arreola v. Ashcroft*, 383 F.3d 956, 963 (9th Cir. 2004).

In *Morales-Izquierdo*, we overruled our decision in *Arreola-Arreola*. We wrote, "Reinstatement of a prior removal order—regardless of the process afforded in the underlying order—does not offend due process because reinstatement of a prior order does not change the alien's rights or remedies." *Morales-Izquierdo*, 486 F.3d at 497. Our dissenting colleague relies on this sentence, but it has no bearing on the case before us.

The question here is not whether Vega-Anguiano was afforded due process in the proceeding that led to the entry of his removal order. The question, rather, is whether the

execution of the removal order—which was invalid at the time of its execution—resulted in a "gross miscarriage of justice." The governing law when we decided *Morales-Izquierdo* was not only, as in *Arreola-Arreola*, that a removal order "that did not comport with due process" could not be reinstated. It was also, as in *Farinas*, that a removal order whose execution resulted in a "gross miscarriage of justice" could not be reinstated. In *Morales-Izquierdo*, we specifically addressed due process and overruled *Arreola-Arreola* by name. We said nothing about gross miscarriage of justice and never mentioned *Farinas*.

We are aware that several of our sister circuits, in addressing petitions for review of reinstatement orders, have required challenges to underlying removal orders be made within thirty days of the entry of the final order of removal. *See Luna-Garcia De Garcia v. Barr*, 921 F.3d 559, 563–65 (5th Cir. 2019); *Mejia v. Sessions*, 866 F.3d 573, 589 (4th Cir. 2017); *Verde-Rodriguez v. Attorney Gen. U.S.*, 734 F.3d 198, 203 (3d Cir. 2013); *Cordova-Soto v. Holder*, 659 F.3d 1029, 1031–32 (10th Cir. 2011). However, none of these decisions recognizes that § 1252(b)(1) applies to both petitions for review of final orders of removal and petitions for review of final reinstatement orders, with the consequence that both kinds of petitions confer jurisdiction under § 1252(a)(1).

Further, in each of these decisions, petitioners alleged constitutional violations in the removal procedures leading to the entry of the final orders of removal. It would have been difficult, to the point of impossibility, to collaterally challenge the removal orders within thirty days in petitions for review of the reinstatement orders. *But see Mejia*, 866 F.3d at 590 ("Mejia warns that our interpretation of § 1252(b)(1) . . . effectively 'abolish[es] review of all

underlying orders in reinstatement,' thereby raising ' "serious constitutional problems" ' . . . . Not so. Rather we think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original removal order reinstated by DHS, and petition for review—all within a month's time." (alteration in original) (citations omitted)). But it would have been possible to bring direct challenges to these removal orders within thirty days of their entry. That is not the case for Vega-Anguiano. It would have been impossible for him to challenge the execution of his removal order within thirty days of the entry of the order, for his conviction was expunged a year later.

Vega-Anguiano does not dispute that he is subject to removal, whether based on a reinstatement order or a new removal order. But the practical difference between the two kinds of orders is, for him, crucial. An alien subject to a new order of removal is eligible for cancellation of removal based on "exceptional and extremely unusual hardship" to qualifying relatives. 8 U.S.C. § 1229b(b)(1). An alien removed under a reinstatement order is ineligible for such relief. 8 U.S.C. § 1231(a)(5). Vega-Anguiano remains married to his U.S. citizen wife, and they now have four U.S. citizen children together. His brief does not spell out the nature and degree of hardship, but it indicates that if subject to removal under a new order of removal he would seek cancellation based on hardship.

## Conclusion

Vega-Anguiano timely challenged his reinstatement order under § 1252(b)(1), and we have jurisdiction under § 1252(a)(1). Collateral attacks on removal orders brought under § 1252(a)(1) are extremely limited, but they are

available when an order results in a "gross miscarriage of justice." Based on *Farinas* and other cases, we conclude that Vega-Anguiano has shown a  gross miscarriage of justice because his 1998 removal order was invalid at the time of his removal in 2008.  We therefore hold that the reinstatement order was improper and grant the petition for review.  We do not reach Vega-Anguiano's regulatory and due process arguments.**²**

**Petition for Review GRANTED.**

CHRISTEN, Circuit Judge, concurring:

I agree that we have jurisdiction to hear Vega-Anguiano's petition for review.  I write separately to emphasize the record in this case, which I conclude necessitates our decision to grant the petition for review.

The government took the position prior to oral argument that Vega-Anguiano did not submit notice of his 1999 expungement order until July of 2014, five months *after* the Department of Homeland Security (the "agency") decided to reinstate the removal order.  However, at oral argument, it was established that counsel did not know what was in the A-

---

**²** Appellant's Motion to Supplement the Record on Appeal [Dkt. No. 21], filed November 16, 2017, is **GRANTED IN PART**, as to Vega-Aguiano's 1999 expungement order.  *See id.* at 38.

File[1] at the time the immigration officer made the February 2014 reinstatement decision. Counsel for the government agreed that the A-File would have been incomplete without the 1999 expungement order. After oral argument, we now know that Vega-Anguiano notified the BIA of his expungement at least by November of 2013, when he attached the 1999 order to his motion to reopen. Although it is not clear when Vega-Anguiano *first* submitted notice of the expungement order to the agency, the record shows that a California Superior Court entered the 1999 expungement order nearly two months before the agency issued the warrant for the order of removal, approximately nine years before the agency removed Vega-Anguiano to Mexico, and almost fifteen years before the agency issued the reinstatement order.

Whether or not the expungement order was filed with the agency prior to November of 2013, the immigration records are riddled with errors that signal the agency had incorrect information. For example, at least one immigration record incorrectly states that Vega-Anguiano was arrested and charged with possession for sale (not simple possession) of cocaine; at least one record shows that he was arrested twice (not once); and others show that he was convicted in 1999 (not 1991), which suggests a second conviction. These errors appear on internal immigration documents that were apparently prepared by agency staff, not on documents submitted by petitioner. We do not know whether they repeat other errors in the A-File. There is no indication of any misconduct—it appears that a few scrivener's errors were

---

[1] "The A-File documents the history of immigrants' and others' interactions with components of the Department of Homeland Security and predecessor agencies." *Dent v. Holder*, 627 F.3d 365, 372 (9th Cir. 2010).

repeated as the case progressed. But, without access to his A-File, Vega-Anguiano could not have known that he needed to bring these errors to the agency's attention. The government's concession that Vega-Anguiano would have qualified for FFOA relief at the time of his 1999 expungement order clears up these errors in the record, but it also underscores that an immigration officer checking the A-File prior to reinstatement of the removal order would have seen several false clues about the appropriateness of reinstatement.

The 1999 expungement order, which was entered prior to the issuance and execution of Vega-Anguiano's warrant of removal, eliminated the legal basis for Vega-Anguiano's removal. Given this sequence of events and status of the record, I concur in granting Vega-Anguiano's petition for review.

---

CALLAHAN, Circuit Judge, dissenting:

As a three-judge panel, we are bound by our precedent. In *Morales-Izquierdo v. Gonzales*, 486 F.3d 484 (9th Cir. 2007) (en banc), we rejected Morales' claim "that a removal order may not constitutionally be reinstated if the underlying removal proceeding itself violated due process." *Id.* at 497. We held that "[r]einstatement of a prior removal order—regardless of the process afforded in the underlying order—does not offend due process because reinstatement of a prior order does not change the alien's rights or remedies." *Id*. Relying on the Supreme Court's opinion in *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 44 (2006), we noted that a petitioner has "no constitutional right to force the government

to re-adjudicate a final removal order by unlawfully reentering the country." *Id.* at 498.[1] It follows that Vega-Anguiano's petition for review that was filed within thirty days of the reinstatement—but almost two decades after his removal order—does not allow us to consider his challenges to the underlying 1998 removal order. This is consistent with the plain text of 8 U.S.C. § 1231(a)(5), which states: "[i]f the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." Accordingly, to the extent that the petition for review challenges Vega-Anguiano's underlying removal order, it should be dismissed.

The majority of our sister circuits are in accord with our position in *Morales-Izquierdo*. *See, e.g.*, *Moreno-Martinez v.*

---

[1] Lest there be any doubt as to our holding we explained:

> If Morales has a legitimate basis for challenging his prior removal order, he will be able to pursue it after he leaves the country, just like every other alien in his position. If he has no such basis, nothing in the Due Process Clause gives him the right to manufacture for himself a new opportunity to raise such a challenge. The contrary conclusion would create a new and wholly unwarranted incentive for aliens who have previously been removed to reenter the country illegally in order to take advantage of this self-help remedy. It would also make a mockery of aliens who do respect our laws and wait patiently outside our borders seeking lawful admission. Nothing in the Constitution requires such a perverse result.

486 F.3d at 498.

*Barr*, 932 F.3d 461, 465 (6th Cir. July 31, 2019) ("[A]ny challenge (collateral or otherwise) filed 30 days after the removal order was filed is untimely and we have no jurisdictional basis to entertain the challenge."); *Luna-Garcia De Garcia v. Barr*, 921 F.3d 559, 565 (5th Cir. 2019) ("[I]f an alien illegally re-enters the United States and his prior removal order is reinstated," then to "preserve our jurisdiction under § 1252(a)(2)(D)'s savings provision, an alien must file a petition for review within 30 days of the removal order as required by § 1252(b)(1), in addition to exhausting all available administrative remedies and demonstrating that the initial proceedings constituted a gross miscarriage of justice."); *Verde-Rodriguez v. Attorney Gen. U.S.*, 734 F.3d 198, 203 (3d Cir. 2013) (finding a lack of jurisdiction over underlying removal order because "Verde's filing of his appeal within thirty days after reinstatement of his removal order does not render his petition timely"); *Cordova-Soto v. Holder*, 659 F.3d 1029, 1032 (10th Cir. 2011) (concluding that an alien petitioning for review of a reinstatement order cannot challenge the original order of removal, including constitutional claims or questions of law, because such a challenge was time-barred by the statutory 30-day limit); *Sharashidze v. Mukasey*, 542 F.3d 1177, 1178–79 (7th Cir. 2008) ("[Section] 1252(a)(2)(D), which authorizes this court to decide constitutional claims and questions of law, is explicitly constrained by the 30-day time limit in § 1252(b)(1).").

Notwithstanding the wealth of authority supporting our position in *Morales-Izquierdo*, the majority, relying on a 1967 decision by the Board of Immigration Appeals, *Matter of Farinas*, 12 I. & N. 467 (BIA 1967), creates a "gross miscarriage of justice" exception to the rule set forth in *Morales-Izquierdo*. The majority's position fails on at least

two grounds: first, *Farinas* is not applicable to Vega-Anguiano's case; and second, even if we were to recognize a "gross miscarriage of justice" exception to *Morales-Izquierdo*, Vega-Anguiano has not made such a showing.

As the majority recognizes, the BIA in *Farinas* held that Farinas' underlying deportation order "could not have withstood judicial attack under the law as it was then (and still is) interpreted." 12 I. & N. Dec. at 472. This is simply not true of Vega-Anguiano's removal order. The expungement of his conviction under a California rehabilitative statute does not mean that his possession offense was no longer a conviction under the immigration laws.[2] *See Nunez-Reyes v. Holder*, 646 F.3d 684, 689–90 (9th Cir. 2011). Moreover, the "fact" that Vega-Anguiano might have been *eligible* for relief under the Federal First Offender Act, had he sought such relief before his removal, does not mean that his removal was legally invalid. Rather, Vega-Anguiano remained removable based on his cocaine conviction until and unless he was granted relief under the Federal First Offender Act, or some other statute.[3] To the extent that the gross miscarriage of justice exception that the

---

[2] *Wiedersperg v. I.N.S.*, 896 F.2d 1179 (9th Cir. 1990), is similarly distinguishable. Wiedersperg's conviction was not expunged, but vacated.

[3] In *Nunez-Reyes* we overruled our prior opinion in *Lujan-Armendariz v. I.N.S.*, 222 F.3d 728 (9th Cir. 2000), and held that "that the constitutional guarantee of equal protection does not require treating, for immigration purposes, an expunged state conviction of a drug crime the same as a federal drug conviction that has been expunged under the FFOA." 646 F.3d at 690. However, we also held that we would only apply our decision prospectively to protect those who relied on *Lujan-Armendariz*. *Id*. at 693–94. It does not appear that Vega-Anguiano relied on *Lujan-Armendariz* prior to our opinion in *Nunez-Reyes*.

majority extracts from *Farinas* depends on the prior deportation or removal order not withstanding judicial attack, Vega-Anguiano has not shown that his removal order was, or is, infirm.

Even if the legal invalidity of the underlying removal order were not an essential component of a "gross miscarriage of justice," Vega-Anguiano has not made a sufficient showing of injustice to invoke our purported jurisdiction. There is no question that he was arrested for possession of cocaine in 1988 and convicted of possession in 1991. As noted, the expungement of his conviction in 1999 under a California rehabilitative statute did not undermine the basis for his removal or make his removal illegal. The fact that the government did not remove Vega-Anguiano until 2008 hardly prejudiced him. Thus, even accepting that Vega-Anguiano might have been eligible for consideration under the First Federal Offender Act after the 1999 expungement—had he requested relief—the government's failure to anticipate such a request does not make his 2008 removal a gross miscarriage of justice. Nor is there any injustice in the reinstatement of his prior removal order after he illegally reentered the United States and was convicted of a misprision of a felony.

I would affirm the BIA's denial of immigration relief because our review of Vega-Anguiano's petition to review his reinstatement order does not extend to considering the merits of his underlying removal order. Moreover, even if there were a "gross miscarriage of justice" exception that created jurisdiction, Vega-Anguiano has not shown any injustice because his prior removal was not illegal either

when he was removed in 2008 or now. Accordingly, I dissent.[4]

W. FLETCHER, Circuit Judge, joined by CHRISTEN, Circuit Judge, concurring in the denial of rehearing en banc:

Our opinion in this case stands on its own. We write here to respond to arguments made by our colleague, who dissents from our court's denial of the petition for rehearing en banc.

In 1987, at age thirteen or fourteen, Francisco Vega-Anguiano entered the United States without inspection. At age fourteen, he was arrested for possession of cocaine. As a condition of non-prosecution, Vega-Anguiano was required to take drug classes. In 1991, Vega-Anguiano was arrested for driving without a license. A record check revealed that he had not completed his drug classes. As a result, the possession charge was revived; Vega-Anguiano pleaded guilty; and he was incarcerated. Upon his release from incarceration, Vega-Anguiano married his girlfriend, who was then a lawful permanent resident (and is now a U.S. citizen). Soon thereafter, Vega-Anguiano and his wife sought to legalize his status.

Vega-Anguiano's Application for Adjustment of Status was denied because of his 1991 possession conviction. In

---

[4] Along with our denial of the petition for rehearing en banc, the panel majority issues a revised opinion. Rather than revise my dissent penned in response to the panel majority's initial opinion, I stand by my initial dissent and join in Judge Bennett's dissent from our denial of the petition for rehearing en banc.

December 1998, he was ordered removed, based on the conviction. In September 1999, while he was still in the United States, his possession conviction was expunged under California Penal Code § 1203.4, a rehabilitative statute. The government conceded at oral argument that the expungement satisfied the criteria of the Federal First Offender Act and eliminated the basis Vega-Anguiano's removal order. Despite the expungement and resulting invalidity of the 1998 removal order, Vega-Anguiano was removed in 2008. *Id.*

Vega-Anguiano re-entered the United States illegally several weeks later. In 2014, the government reinstated Vega-Anguiano's 1998 removal order. Vega-Anguiano petitioned for review of the reinstatement order within thirty days of its entry.

Vega-Anguiano concedes that he is subject to removal, whether based on a new removal order or on the reinstatement order. But the practical difference between the two kinds of orders is, for him, crucial. An alien subject to a new order of removal is eligible for cancellation of removal based on "exceptional and extremely unusual hardship" to qualifying relatives. 8 U.S.C. § 1229b(b)(1). An alien removed under a reinstatement order is ineligible for such relief. 8 U.S.C. § 1231(a)(5). Vega-Anguiano remains married to his U.S. citizen wife, and they have four U.S. citizen children together. In his brief to us, he indicated that if subject to removal under a new order of removal he would seek cancellation based on hardship.

The question before us was whether, as part of a timely challenge to his reinstatement order, Vega-Anguiano can collaterally challenge the underlying removal order. We

concluded that Vega-Anguiano could bring such a collateral challenge.

Our dissenting colleague argues that we have misread 8 U.S.C. § 1252(b)(1). He contends that Vega-Anguiano has not timely filed his petition for review of a reinstatement order and that he therefore cannot bring a collateral challenge to the reinstated invalid removal. We disagree.

There are two related questions. The first is a narrow textual statutory question, divorced from context and purpose. The second is a broader statutory question that takes into account context and purpose. We address them in turn.

The first question focuses solely on the text of § 1252(b)(1). Section 1252(b)(1) provides, "The petition for review must be filed not later than thirty days after the date of the final order of removal." The question is whether the term "order of removal" includes an order reinstating a removal order. Stated otherwise, the question is whether § 1252(b)(1) establishes the thirty-day time limit within which a petition for review of a reinstatement order must be filed. As we explained in our opinion, the answer has to be "yes."

It is uncontested that there is a thirty-day time limit for filing a petition for review of a reinstatement order. It is also uncontested that there is a statutory provision setting a time limit for that petition. There is no provision other than § 1252(b)(1) that can possibly be read to provide the limit. Our dissenting colleague does not, and cannot, point to a statutory provision other than § 1252(b)(1) that provides a time limit.

The second question is whether, in light of context and purpose, the most plausible reading of § 1252(b)(1) is that it provides a time limit for a petition for review of a reinstatement order that is different from the time limit for a petition for review of the original removal order. As we also explained in our opinion, the answer has to be "yes." Our dissenting colleague, as well as circuit court decisions that he cites, agree that a petitioner challenging a reinstatement order may, as part of that challenge, bring a collateral challenge to the original removal order. But they conclude that the petition for review of the reinstatement order must be filed within thirty days of the original removal order. That is, they conclude that the thirty-day time limits for bringing direct and collateral challenges to an original removal order both run from the same date—the date of entry of the original removal order.

Our colleague writes:

> Eight other circuits have faithfully applied § 1252(b)(1)'s thirty-day deadline to the underlying "order of removal," as the statute clearly and unambiguously requires—most recently the Eighth Circuit in *Lara-Nieto v. Barr*, 945 F.3d 1054 (8th Cir. 2019). That court surveyed the decisions of the other circuits, finding that they 'have almost uniformly held that' to collaterally challenge a removal order on reinstatement, 'an alien must file his petition for review within thirty days of the date of the removal order, not within 30 days of the order reinstating the removal order.' *Id.* at 1060 n.4; [citing cases].

Diss. Op. at 43–44.

There are three problems with the conclusion of our colleague and the other circuits. First, the conclusion conflates direct and collateral challenges. Any challenge to an original order brought within thirty days of its entry under § 1252(b)(1) is necessarily a direct rather than a collateral challenge. If the time for filing a direct and a collateral challenge run from the same date, there is never a reason to bring a collateral challenge. Collateral challenges are more limited than direct challenges. No litigant, given a choice between a direct and collateral challenge, would ever choose a collateral challenge.

Second, it is not possible as a practical matter to bring a challenge to a reinstatement order within thirty days of the entry of the underlying removal order. If § 1252(b)(1) does not provide a separate time period for filing a petition for review of a reinstatement order, running from the date of that order, no reinstatement order can ever be challenged, on any ground. The Fourth Circuit has made a heroic argument to the contrary, contending that a challenge to a reinstatement order can feasibly be brought within thirty days of the entry of the original removal order: "[W]e think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original order reinstated by DHS, and petition for review—all within a month's time." *Mejia v. Sessions*, 866 F.3d 573, 590 (4th Cir. 2017). Simply to read the argument is to understand why, in the real world, it is fanciful.

Finally, if a collateral challenge to a removal order must be made within the same time period as a direct challenge, the basis for some collateral attacks will not yet exist. The case

before us is an example. When the original removal order was entered against Vega-Anguiano in 1998, it was valid. Any challenge brought within thirty days of its entry would necessarily have failed. A year later, the possession conviction was expunged. The expungement removed the legal basis for the removal order, but by this time, more than thirty days had passed since its entry. If our dissenting colleague and the other circuits are right that a collateral challenge must be brought within thirty days of the entry of the original removal order, a challenge that they agree in theory is available, cannot in fact be brought.

\* \* \*

The government in this case has reinstated a concededly invalid removal order. Vega-Anguiano has challenged the reinstatement based on the invalidity of the reinstated order.

Our colleague does not dispute that a timely filed challenge to a reinstatement order under § 1252(b)(1) allows the exercise of jurisdiction under § 1252(a)(1). Nor does he dispute that in the exercise of jurisdiction under § 1252(a)(1) a court may consider any collateral attack authorized under § 1252(a)(2)(D). Nor, finally, does he dispute that a collateral attack under § 1252(a)(2)(D) may include a challenge to a removal order that resulted in a "gross miscarriage of justice." Our colleague disputes only our conclusion that Vega-Anguiano timely filed a challenge to his reinstatement order under § 1252(b)(1). For the reasons stated above and in our opinion, we disagree with our colleague on this point.

BENNETT, Circuit Judge, with whom CALLAHAN, M. SMITH, IKUTA, R. NELSON, BADE, COLLINS, LEE, BRESS, HUNSAKER, BUMATAY, and VANDYKE, Circuit Judges, join, dissenting from the denial of rehearing en banc:

This case turns on a straightforward statute. So plain is the statutory text that all eight other circuits that have interpreted the statute reached the same conclusion. The panel majority reached the contrary conclusion.[1] I respectfully dissent from our failure to take this case en banc.

Under the Immigration and Nationality Act ("INA"), when an alien is ordered removed and seeks to challenge the removal, "[t]he petition for review must be filed not later than 30 days after the date of the final *order of removal*." 8 U.S.C. § 1252(b)(1) (emphasis added). If a removed alien illegally reenters the country, the government may opt for an expedited removal process by issuing a reinstatement order that gives effect to the original order of removal.[2] *See* 8 U.S.C. § 1231(a)(5).

The question is the following: When there is both an original order of removal and a new reinstatement order, what does "order of removal" in § 1252(b)(1) mean? Our sister circuits think "order of removal" means "order of removal." The majority, apparently unhappy with the statute Congress

---

[1] Judge Callahan agreed with our sister circuits and dissented.

[2] Reinstatements comprise about forty percent of total removals. *See* Dept. of Homeland Sec., Immigration Enforcement Actions: 2018 Annual Flow Report at 9 (Oct. 2019), *available at* https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/enforcement_actions_2018.pdf (last visited on October 10, 2020).

wrote, rewrites "order of removal" as "reinstatement order." The opinion then works backwards to rationalize the rewrite through a series of inaccurate and internally inconsistent statements. No wonder our court is on the solitary side of an eight-to-one circuit split.

I.

Francisco Javier Vega-Anguiano is a native and citizen of Mexico. In 1987, he entered the United States without inspection. In 1991, he was convicted of possession of cocaine in violation of California law. In 1998, an immigration judge ("IJ") ordered him removed for having been convicted of a controlled substance violation. He filed an appeal to the Board of Immigration Appeals ("BIA"), and the BIA denied it as untimely. Vega-Anguiano did not seek judicial review in 1998.

In 1999, when Vega-Anguiano was still in the United States, his cocaine conviction was expunged under a California rehabilitative statute.[3] *See* Cal. Penal Code § 1203.4. He did not move to reopen or notify the immigration authorities of the expungement. Vega-Anguiano did not seek judicial review in 1999.

In 2008, Immigration and Customs Enforcement arrested Vega-Anguiano and removed him to Mexico under the 1998 removal order. Vega-Anguiano did not seek judicial review in 2008. Nor did he inform the government that the 1998 removal order was based on an expunged conviction.

---

[3] The expungement was not based on any claim that Vega-Anguiano had not committed the crime.

Within a few weeks of his removal, Vega-Anguiano illegally reentered the United States. In August 2013, he was arrested for his involvement in a cockfighting venture and charged with illegal gambling business, conspiracy to violate the Animal Welfare Act, and unlawful animal fighting venture. Those charges were dismissed, but he pleaded guilty to misprision of a felony (related to the cockfighting) in violation of 18 U.S.C. § 4.

In November 2013, Vega-Anguiano moved to reopen his 1998 removal proceeding, explaining that his 1991 conviction had been expunged and contending that his former attorneys had provided him with ineffective assistance. The BIA denied the motion as untimely. A prior panel of our court affirmed the BIA's denial, explaining that the "BIA did not abuse its discretion in denying Vega-Anguiano's motion to reopen as untimely where it was filed more than 14 years after the order of removal became final, and Vega-Anguiano failed to establish he acted with the due diligence required for equitable tolling of the filing deadline."

In February 2014, the Department of Homeland Security reinstated the 1998 order of removal, finding that Vega-Anguiano had illegally reentered the United States after having been previously removed. Vega-Anguiano petitioned our court for review in 2015. His petition sought review of two orders: direct review of the 2014 reinstatement order and collateral review of the 1998 removal order.

Without reviewing the reinstatement order, the panel majority granted Vega-Anguiano's petition on the ground that the 1998 removal order was based on an expunged conviction.

## II.

The panel majority impermissibly expands our court's jurisdiction. The statute governing petitions for review is simple and straightforward: "The petition for review must be filed not later than 30 days after the date of the final order of removal." 8 U.S.C. § 1252(b)(1). The thirty-day deadline rule is "mandatory and jurisdictional, because it is imposed by statute." *Magtanong v. Gonzales*, 494 F.3d 1190, 1191 (9th Cir. 2007) (per curiam) (citation omitted). Under § 1252(b)(1), our court lacks jurisdiction to review untimely challenges to removal orders.

Vega-Anguiano's petition for review was filed in 2015—about seventeen years after the final order of removal was issued. The majority nevertheless concludes that Vega-Anguiano's challenge was timely under § 1252(b)(1), and that our court has jurisdiction over his 2015 challenge to the 1998 removal order.

Despite § 1252(b)(1)'s unambiguous thirty-day time limit that runs from "the date of the final order of removal," the majority reads § 1252(b)(1) as requiring only that the reinstatement order be challenged within thirty days of becoming final. Majority Opinion at 11. According to the majority, Vega-Anguiano's 2015 collateral challenge to the 1998 *removal order* was timely because it was made within thirty days of the *reinstatement order*. *Id.* at 11 ("Because Vega-Anguiano filed his petition for review of his reinstatement order under § 1252(b)(1), he may bring any collateral attack [of the removal order] authorized by § 1252(a)(1)."). In other words, on reinstatement, § 1252(b)(1)'s "order of removal" does not actually mean orders of removal but refers to reinstatement orders instead.

A reinstatement order is not a removal order, and the two are neither synonymous nor interchangeable. "Congress has defined an order of removal as 'the order' of the IJ 'concluding that the alien is deportable or ordering deportation.'" *Abdisalan v. Holder*, 774 F.3d 517, 523 (9th Cir. 2014) (en banc) (footnote omitted) (quoting 8 U.S.C. § 1101(a)(47)(A)). Before issuing an order of removal, an immigration judge must determine (i) "whether the individual is removable" and (ii) "whether the individual is otherwise eligible for relief from removal." *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 491 (9th Cir. 2007) (en banc). By contrast, reinstatement of removal is a summary procedure for aliens who have already been removed in the past. If "an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal," an immigration officer issues a reinstatement order. 8 U.S.C. § 1231(a)(5). The reinstatement order does not reissue a removal order. Rather, it restores "the prior order of removal . . . from its original date," and "the alien shall be removed under the prior order." *Id.*

An alien subject to reinstatement may petition for judicial review of the reinstatement order. *Castro-Cortez v. INS*, 239 F.3d 1037, 1043–44 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). Our review of the reinstatement order is "limited to confirming the agency's compliance with the reinstatement regulations." *Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1137 (9th Cir. 2008). On reinstatement, collateral review of the underlying removal order is barred by statute. The INA provides that "the prior order . . . is not subject to being reopened or reviewed." 8 U.S.C. § 1231(a)(5). But our court recognizes a narrow exception

for a "gross miscarriage of justice" in the underlying removal proceeding. *Garcia de Rincon*, 539 F.3d at 1138.[4]

Even under the exception, § 1252(b)(1)'s deadline still applies, and courts lack jurisdiction unless the petition for review was filed within "30 days after the date of the final order of removal." 8 U.S.C. § 1252(b)(1). The majority acknowledges that § 1252(b)(1) applies but does not apply it as Congress wrote it. By crossing out the statutory text of "order of removal" and replacing it with "reinstatement order," the majority deems a seventeen-year-old challenge timely under a thirty-day deadline.

The majority attempts to distract attention from its statutory rewrite by confusing the issue: "The question is whether § 1252(b)(1) establishes the time limit not only for challenging final orders of removal, but also for challenging final reinstatement orders. The answer is 'yes.'" Majority Opinion at 11. That is not the relevant question. There is no dispute that a petitioner must challenge a reinstatement order within thirty days of the reinstatement order becoming final, and that Vega-Anguiano timely challenged the 2014 reinstatement order. But the majority expressly does not review the reinstatement order. *See id.* at 23–24. Instead, the majority reviews Vega-Anguiano's 2015 challenge to the 1998 removal order and concludes that the removal order was invalid when executed. *See id.* at 23–24. As the majority

---

[4] In addition to asking us to apply § 1252(b)(1) as written, the government's rehearing petition also asked us to overrule *Garcia de Rincon.* PFREB at 2. My dissent here is not based on our failure to do so. The majority's decision is wrong even if *Garcia de Rincon* was correctly decided. But I anticipate that the government may continue to argue that *Garcia de Rincon* should be overruled.

recognizes, "§ 1252(b)(1) establishes the time limit not only for challenging final orders of removal, but also for challenging final reinstatement orders." *Id.* at 11. Here, it is irrelevant that Vega-Anguiano timely challenged the reinstatement order that the majority does not review. Vega-Anguiano's challenge to the order that the majority *does* review—the 1998 removal order—was made seventeen years after that order became final, and it was therefore untimely under § 1252(b)(1).**[5]**

Eight other circuits have faithfully applied § 1252(b)(1)'s thirty-day deadline to the underlying "order of removal," as the statute clearly and unambiguously requires—most recently the Eighth Circuit in *Lara-Nieto v. Barr*, 945 F.3d 1054 (8th Cir. 2019). That court surveyed the decisions of the other circuits, finding that they "have almost uniformly held that" to collaterally challenge a removal order on reinstatement, "an alien must file his petition for review within 30 days of the date of the underlying removal order, not within 30 days of the date of the order reinstating the removal order." *Id.* at 1060 n.4; *see also Verde-Rodriguez v. Att'y Gen. U.S.*, 734 F.3d 198, 203 (3d Cir. 2013); *Mejia v. Sessions*, 866 F.3d 573, 589 (4th Cir. 2017); *Luna-Garcia de Garcia v. Barr*, 921 F.3d 559, 565 (5th Cir. 2019); *Moreno-*

---

**[5]** Further, the majority incorrectly cites our decision in *Villa-Anguiano v. Holder*, 727 F.3d 873 (9th Cir. 2013), to support the proposition that "[i]n the exercise of [jurisdiction over challenges to reinstatement orders], we may consider *any* collateral attack authorized under § 1252(a)(2)(D)." Majority Opinion at 12 (emphasis added) (citing *Villa-Anguiano*, 727 F.3d at 875). In *Villa-Anguiano*, we did not consider a collateral attack and expressly stated that "[b]ecause this case does not directly involve a challenge to the [underlying removal] order, we need not decide whether § 1252(b)(1) would preclude such review." 727 F.3d at 879 n.4 (cross-reference omitted).

*Martinez v. Barr*, 932 F.3d 461, 465 (6th Cir. 2019); *Villa v. Barr*, 924 F.3d 370, 374 (7th Cir. 2019); *Cordova-Soto v. Holder*, 659 F.3d 1029, 1032 (10th Cir. 2011); *Avila v. U.S. Att'y Gen.*, 560 F.3d 1281, 1285 (11th Cir. 2009) (per curiam).**[6]**

"*But see*," the court noted, the Ninth Circuit's opinion in *Vega-Anguiano*. *Lara-Nieto*, 945 F.3d at 1060 n.4.

## III.

Recognizing that its novel interpretation has no support in the text, the majority relies on three inapposite sources.

*1.* The majority opinion states that in *Castro-Cortez v. INS*, we held "that the phrase 'final order of removal' in § 1252(a)(1) covers both a final removal order and a final

---

**[6]** The majority acknowledges some of these cases but states that "none of these decisions recognizes that § 1252(b)(1) applies to both petitions for review of final orders of removal and petitions for review of final reinstatement orders." Majority Opinion at 22. In other words, the majority faults our sister circuits for not making the same irrelevant point that the majority does. The relevant question in those cases (and in this case) is whether the petitioner's challenge to the underlying removal order was timely. There is no need to apply § 1252(b)(1) to the reinstatement order if the reinstatement order is not under review. By contrast, when courts review both the reinstatement order and the removal order, they require that each order under review be timely challenged. *See Moreno-Martinez*, 932 F.3d at 464 (explaining that the court had "jurisdiction to hear Petitioner's due-process challenge to the reinstatement order," but "lack[ed] jurisdiction to review Moreno-Martinez's . . . removal order, because that challenge is time-barred" by 8 U.S.C. § 1252(b)(1)); *Cordova-Soto*, 659 F.3d at 1031–32 (reviewing timely challenge to reinstatement order but declining to review untimely challenge to underlying removal order).

reinstatement order." Majority Opinion at 11. The majority claims that it follows *Castro-Cortez* to read § 1252(b)(1)'s "final order of removal" in the same way. Majority Opinion at 11 ("The natural, indeed inescapable, reading of these immediately adjoining statutory sections is that phrase 'final order of removal' in § 1252(b)(1) has the same meaning as the identical phrase in § 1252(a)(1).").

But in its analysis, the majority contradicts itself and reads § 1252(b)(1) in a strikingly different way. The majority does not read "order of removal" in § 1252(b)(1) as applying to *both* removal orders and reinstatement orders. Rather, the majority reads "order of removal" as applying to *only* reinstatement orders. According to the majority, "Vega-Anguiano timely petitioned for review of his reinstatement order under § 1252(b)(1)," so the court may consider his seventeen-year-old collateral challenge to the removal order. *Id.* at 4. Under the majority's analysis, § 1252(b)(1) simply does not apply to the final order of removal.

As the majority opinion notes, *Castro-Cortez* interpreted § 1252(a)(1), which establishes our jurisdiction to review a "final order of removal." 8 U.S.C. § 1252(a)(1). In *Castro-Cortez*, we read "final order of removal" broadly to include reinstatement orders in addition to removal orders. *Castro-Cortez*, 239 F.3d at 1043–44. Thus, our court has jurisdiction over both reinstatement orders and orders of removal. But in the reinstatement context, the majority reads § 1252(b)(1)'s "order of removal" to exclude actual removal orders. Had the majority truly interpreted "order of removal" as including "both" types of orders, it would have applied § 1252(b)(1)'s

thirty-day deadline to the 1998 removal order and held that Vega-Anguiano's 2015 challenge was untimely.[7]

*2.* Ignoring our own precedent and relying on a BIA decision, the majority opinion states: "We have *never addressed* whether the gross miscarriage of justice standard includes a diligence component. The controlling BIA decision is [*Matter of*] *Farinas*[, 12 I. & N. Dec. 467 (BIA 1967)]." Majority Opinion at 11 (emphasis added).

This statement is wrong. In *De Souza v. Barber*, 263 F.2d 470 (9th Cir. 1959), we *did* address whether there is a timeliness requirement that can bar a collateral attack in reinstatement proceedings based on a purported gross miscarriage of justice, and we held that there is. Like Vega-Anguiano, De Souza did not seek judicial review of his underlying removal order until he raised a collateral challenge on reinstatement. *Id.* at 474. His petition for review was filed twenty-six years after the removal order but just three days after the reinstatement order. *Id.* at 473–74. And like Vega-Anguiano, De Souza argued that he had suffered a gross miscarriage of justice because the original removal order was legally invalid.

Unlike the majority here, *De Souza* declined to "disinter [the] first deportation order which was issued [twenty-six years before the collateral challenge] and examine the

---

[7] Our sister circuits have their own versions of *Castro-Cortez* that allow judicial review of the reinstatement order itself. But no other circuit confuses "both" and "only" like the majority does. *See, e.g.*, *Verde-Rodriguez*, 734 F.3d at 202 (citing *Debeato v. Att'y Gen. U.S.*, 505 F.3d 231, 234–35 (3d Cir. 2007)); *Moreno-Martinez*, 932 F.3d at 463 (citing *Villegas de la Paz v. Holder*, 640 F.3d 650, 654 (6th Cir. 2010)).

evidence on which it was based." *Id.* at 474. Despite that there was no statute imposing a thirty-day deadline when *De Souza* was decided, our court still held that De Souza's collateral challenge was untimely.

The majority opinion makes no mention of *De Souza*. Even if *De Souza* did not exist, *Farinas* is irrelevant. *Farinas* was silent on the relevant issue—timeliness. More importantly, § 1252(b)(1) circumscribes *our* jurisdiction, which is not defined by the BIA.

*3.* The majority also cites the "equitable concept that diligence should not be demanded of individuals who were previously removed on an invalid legal basis," and applies this equitable concept by pointing out that Vega-Anguiano would not be able to challenge his 1998 removal order if the statutory deadline applied.[8] Majority Opinion at 20, 23.

Even assuming this equitable principle exists, it is irrelevant. "Judicial review provisions" of the INA are "jurisdictional in nature and must be construed with strict fidelity to their terms." *Stone v. INS*, 514 U.S. 386, 405 (1995). "This is all the more true of statutory provisions specifying the timing of review"—including § 1252(b)(1)— and "time limits are . . . mandatory and jurisdictional." *Id.* (citation and internal quotation marks omitted). The majority's reliance on equitable ideas directly contravenes the Supreme Court's instruction that mandatory time limits "are

---

[8] The majority contends that by applying § 1252(b)(1) as written, some collateral challenges would be made more difficult, while Vega-Anguiano's particular challenge would be impossible. Majority Opinion at 22–23. There is of course no requirement that § 1252(b)(1) be read to guarantee that Vega-Anguiano's petition can be granted.

not subject to equitable tolling," *id.*, and our own precedent that "courts lack the authority to create equitable exceptions" to the jurisdictional rule imposed by Congress. *Magtanong*, 494 F.3d at 1191.

## IV.

The majority's decision will lead to unjust outcomes and perverse incentives. In *Morales-Izquierdo*, an en banc panel of our court warned that "an alien who respects our laws and remains abroad after he has been removed should have no fewer opportunities to challenge his removal order than one who unlawfully reenters the country despite our government's concerted efforts to keep him out."[9] 486 F.3d at 498. The majority's decision turns this obvious principle on its head and rewards those who break the law.

We routinely deny petitions for review that do not meet § 1252(b)(1)'s thirty-day deadline. The majority's decision waives that timeliness requirement and gives the removed alien a second bite at the apple, provided that he illegally reenters the country and is subject to a reinstatement order. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 44 (2006) (noting that the "predicate action" for reinstatement is the alien's "indefinitely continuing violation" of unlawfully remaining in the country). The alien with the same claim who does not illegally reenter, however, gets no such chance.

---

[9] We also aptly noted: "While aliens have a right to fair procedures, they have no constitutional right to force the government to re-adjudicate a final removal order by unlawfully reentering the country. Nor is the government required to expend vast resources on extraneous procedures before reinstating a removal order that has already been finalized and executed." *Morales-Izquierdo*, 486 F.3d at 498.

The facts here add another layer of perversity. Vega-Anguiano has already come before our court: In 2014, he sought judicial review of the BIA's denial of his untimely motion to reopen. He requested equitable tolling of the deadline for a motion to reopen, explaining that his "1991 simple possession was expunged pursuant to California's rehabilitative statute," and arguing that the "conviction may not form the basis for any finding of inadmissibility or deportability." A prior panel of our court affirmed the BIA's denial of the motion to reopen, explaining that it was filed fourteen years too late and that Vega-Anguiano failed to establish that he acted with due diligence.

Under the majority's rule, due diligence is not required. Vega-Anguiano can essentially reverse the prior panel's decision and get a *third* bite at the apple, only because of his illegal reentry.

*     *     *

An eight-to-one circuit split should give us pause. The panel majority's decision is wrong not because it is an outlier. But it is an outlier because our sister circuits correctly read an unambiguous statute to mean what it says, while the majority ignores the statutory text altogether. We should have taken the case en banc to correct this error ourselves.